**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**SAMUEL SAXON,**

**Defendant.**

**Case No.: 1:25-CR-138**

**Judge McFarland**

**UNITED STATES' SENTENCING MEMORANDUM**

The United States of America hereby files its sentencing memorandum in the above-captioned matter.

Respectfully submitted,

DOMINICK S. GERACE II
UNITED STATES ATTORNEY

*/s/ Julie D. Garcia / Ashley N. Brucato*
JULIE D. GARCIA (CA 288624)
Special Assistant United States Attorney
ASHLEY N. BRUCATO (OH 90989)
Assistant United States Attorney
United States Attorney's Office
221 E. Fourth St. – Suite 400
Cincinnati, OH 45202
Julie.Garcia@usdoj.gov
Ashley.Brucato@usdoj.gov

# TABLE OF CONTENTS AND SUMMARY

**I. INTRODUCTION** .......... 1

This case is about the defendant, Samuel Saxon, formerly a supervisor with U.S. Immigration and Customs Enforcement, lying to an agent with the Department of Homeland Security, Office of Inspector General, about violently attacking his girlfriend, Individual 1. Saxon has a long history of violently abusing Individual 1, and there is also substantial evidence that he defrauded the government by failing to report for duty as required while claiming full-time work on his timesheets. The United States respectfully requests that the Court impose the maximum sentence of five years in prison and three years of supervised release, as well as the mandatory $100 special assessment and a fine in the Court's discretion.

**II. FACTUAL BACKGROUND** .......... 1

**A. In September 2025, the government began investigating allegations of years-long domestic abuse by Saxon against his girlfriend, Individual 1.** .......... 1

The DHS OIG opened an investigation after receiving allegations that Saxon had physically abused and repeatedly threatened to kill Individual 1, who feared reporting him.

**B. Police reports, recordings, and other sources all corroborated the allegations of severe abuse.** .......... 2

The DHS OIG's investigation documented ears of escalating violence, including repeated death threats, strangulation, and [redacted][1]

**C. On December 5, 2025, a neighbor saw Saxon put Individual 1 in a chokehold and drag her into their apartment.** .......... 6

An eyewitness reported seeing Saxon drag Individual 1 into his apartment on December 5, 2025, and responding officers observed bruising on her neck consistent with strangulation.

**D. After his arrest a few hours later, Saxon lied to a federal agent about the attack on Individual 1.** .......... 7

Saxon repeatedly denied having any in-person contact with Individual 1 on December 5, 2025, even after investigators confronted him with the allegations.

**E. At the same time that he was abusing Individual 1, Saxon was also failing to report for duty, submitting false time sheets, failing to report police contacts, and being disrespectful to his supervisors.** .......... 10

While collecting a federal law enforcement supervisor's salary, Saxon repeatedly neglected his duties, submitted false timesheets, and was insubordinate toward his supervisors.

[1] Certain portions of this memorandum have been provisionally redacted pursuant to the United States' Motion for Leave to File Under Seal. The redactions concern sensitive medical information relating to Individual 1 and records from a separate administrative proceeding involving the defendant. The government has requested provisional sealing pending further review of applicable privacy and disclosure restrictions, without prejudice to any interested person's ability to seek access to the sealed judicial record.

1. **Saxon was commonly erratic and disrespectful toward his supervisors.** .......... 10

Saxon repeatedly refused instructions, sent hostile messages to supervisors, and threatened to resign when asked to perform routine duties.

2. **Saxon commonly showed up late, left early, took long lunches, or didn't show up at all—and then claimed full-time, in-person work on his timesheets.** .......... 11

ICE access records, surveillance footage, and witness accounts show that Saxon routinely claimed payment for hours he did not work.

3. **Saxon never reported any of his contacts with police to ICE, even though he was required to do so by DHS policy.** .......... 13

Despite approximately two dozen police responses to his Cincinnati residences, Saxon never reported these contacts to ICE as required by DHS policy.

4. **Earlier employment records provide additional context for Saxon's workplace misconduct.** .......... 14

[redacted]

**III. LEGAL STANDARD** .......... **16**

**A. Procedures for Determining a Sentence** .......... **16**

The Court must correctly calculate the advisory Guidelines range and then independently evaluate the factors in 18 U.S.C. § 3553(a) to impose a sentence sufficient, but not greater than necessary, to achieve the purposes of sentencing.

**B. Courts may vary upward from the guidelines range if the § 3553(a) factors warrant it.** .......... **16**

Courts may consider a defendant's uncharged conduct, background, and character when determining whether an upward variance is warranted under § 3553(a).

**IV. ARGUMENT** .......... **17**

**A. The PSR sets out the correct statutory maximums and Guidelines range.** .......... **17**

The PSR correctly calculates an advisory imprisonment range of 15-21 months and a statutory maximum of five years' imprisonment, three years of supervised release, and a $250,000 fine.

**B. A consideration of the § 3553(a) factors shows that a sentence at the statutory maximum of five years' imprisonment and three years of supervised release, as well as a fine, is appropriate in this case.** .......... **18**

The seriousness of Saxon's conduct, his history of violence and dishonesty, and the need for deterrence and protection of the public warrant an upward variance to the statutory maximum of five years' imprisonment.

**1. The nature and circumstances of this offense support a sentence of five years.** ................ 19

Saxon repeatedly lied to federal investigators to conceal his own violent abuse of Individual 1, including years of assaults and death threats. The seriousness of the underlying violence, his efforts to obstruct the investigation of that violence, and his repeated opportunities to tell the truth distinguish this case from an ordinary false-statement offense and warrant a substantial upward variance.

**2. Saxon's history and characteristics further support the requested sentence.** .................. 21

Saxon's privileged background and lengthy career as a federal law enforcement officer provide little mitigation in the face of his sustained violence, dishonesty, and workplace misconduct. His position of trust makes his conduct particularly egregious and provides additional justification for an upward variance.

**3. A five-year sentence is necessary to deter Saxon from committing future crimes and to protect Individual 1, as well as to send a message of general deterrence.** ............... 23

Saxon's years-long pattern of violence, continuing despite repeated police interventions, demonstrates the need for a substantial sentence to protect Individual 1 and deter future misconduct. A five-year sentence would also deter other law enforcement officers from obstructing criminal investigations.

**4. A three-year term of supervised release, with a special condition limiting contact with Individual 1, would support the goals of sentencing in this case.** ............................... 24

The government requests three years of supervised release, including a condition prohibiting Saxon from contacting Individual 1 without prior approval of the Probation Office. This narrowly tailored restriction would help protect Individual 1 from renewed abuse while permitting contact if circumstances warrant.

**5. A fine is also appropriate.** ........................................................................................ 25

Saxon's substantial earnings and assets, together with his pattern of collecting government compensation for work he did not perform, support a meaningful fine. Such a fine would promote respect for the law, provide just punishment, and deter similar misconduct by public employees.

**C. The United States further requests that the Court consider whether some or all of the costs of Saxon's court-appointed representation should be reimbursed pursuant to 18 U.S.C. § 3006A.** ........................................................................................................ **27**

Given Saxon's reported assets, including approximately $800,000 in retirement savings, the government requests a financial inquiry into his ability to reimburse some or all of the costs of his court-appointed representation pursuant to 18 U.S.C. § 3006A.

**V. CONCLUSION** ........................................................................................................... **28**

The United States requests a sentence of five years' imprisonment, three years of supervised release with the proposed special condition, an appropriate fine, and the mandatory special assessment. The government further requests that the Court conduct an inquiry into whether Saxon should reimburse some or all of the costs of his court-appointed representation.

# TABLE OF AUTHORITIES

## Cases

*Brogan v. United States*, 522 U.S. 398 (1998) .......... 19
*Gall v. United States*, 552 U.S. 38 (2007) .......... 16
*United States v. Alsante*, 812 F.3d 544 (6th Cir. 2016) .......... 17
*United States v. Cechini*, 834 F. App'x 201 (6th Cir. 2020) .......... 24
*United States v. Cordero*, 609 F. App'x 73 (3d Cir. 2015) .......... 23
*United States v. Demma*, 948 F.3d 722 (6th Cir. 2020) .......... 16
*United States v. Fein*, 843 F. App'x 765 (6th Cir. 2021) .......... 24
*United States v. Fein*, 843 F. App'x 765 (6th Cir. 2021) .......... 20
*United States v. Gangapersad*, No. 22-cr-3171, 2023 WL 8540428 (2d Cir. Dec. 11, 2023) .......... 21
*United States v. Gilliland*, 312 U.S. 86 (1941) .......... 19
*United States v. McCafferty*, 482 F. App'x 117 (6th Cir. 2012) .......... 21, 23
*United States v. Rayyan*, 885 F.3d 436 (6th Cir. 2018). .......... 17
*United States v. Richart*, 662 F.3d 1037 (8th Cir. 2011) .......... 21
*United States v. Smith*, 516 F.3d 473 (6th Cir. 2008) .......... 21
*United States v. Tanzer*, No. 3:24-CR-107, ECF No. 66 (S.D. Ohio Jan. 29, 2026) .......... 20
*United States v. Williams*, 169 F.4th 727 (6th Cir. 2026) .......... 25
*United States v. Williams,* 807 F. App' x 505 (6th Cir. 2020) .......... 17
*United States v. Wilson*, 597 F.3d 353 (6th Cir. 2010) .......... 27

## Statutes

18 U.S.C. § 1001 .......... *passim*
18 U.S.C. § 3006A .......... 1, 26, 27
18 U.S.C. § 3661 .......... 17
18 U.S.C. § 3553(a) .......... *passim*
18 U.S.C. § 3572 .......... 25, 26
18 U.S.C. § 3583(d)(1) .......... 24

## Other Authorities

142 Cong. Rec. S4857 (May 8, 1996) .......... 19
Deyo, Russell C., "Required Reporting of Off-Duty Contact with Law Enforcement by DHS Law Enforcement Personnel and the Suspension and/or Revocation of Authority to Carry a Firearm or other Weapon and Perform Law Enforcement Duties" (Jan. 10, 2017) .......... 13
U.S.S.G. § 1B1.4 .......... 17
U.S.S.G. § 2A6.2 .......... 18
U.S.S.G. § 2B1.1 .......... 18
U.S.S.G. § 2J1.2 .......... 18
U.S.S.G. § 5E1.2 .......... 25, 26
U.S.S.G. § 2X3.1 .......... 18

## I. INTRODUCTION

For nearly twenty years, defendant Samuel Saxon had the privilege of serving the United States as a federal law enforcement officer with U.S. Immigration and Customs Enforcement. But behind closed doors, he was the one breaking the law. For years, he threatened to kill and violently abused his girlfriend, Individual 1, a woman almost twenty years his junior. His abuse repeatedly sent her to the hospital, including [redacted]

In 2025, when a federal agent questioned Saxon about his abuse of Individual 1, he repeatedly lied and denied harming her. He now stands before the Court for sentencing after pleading guilty to one count of making false statements in violation of 18 U.S.C. § 1001.

But Saxon's lies to the agent and his crimes against Individual 1 were not the only ways in which he violated the trust placed in him as a law enforcement officer. While being paid a supervisor's salary and earning government retirement benefits, Saxon commonly showed up late, left early, or skipped work entirely—all while falsely claiming full-time work on his paysheets.

As set forth below, the § 3553(a) factors support a sentence at the statutory maximum: five years' imprisonment. The United States further requests that the Court impose a three-year term of supervised release, a fine in an amount the Court deems appropriate, and the mandatory $100 special assessment.

The United States also requests that the Court consider whether some or all of the costs of Saxon's court-appointed representation should be reimbursed pursuant to 18 U.S.C. § 3006A.

## II. FACTUAL BACKGROUND

### A. In September 2025, the government began investigating allegations of years-long domestic abuse by Saxon against his girlfriend, Individual 1.

In September 2025, the government learned of allegations that Samuel Saxon—then the

Assistant Field Office Director for the Cincinnati Sub Office of U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations—had engaged in years-long physical abuse of his girlfriend, Individual 1. The report alleged that Individual 1 was afraid to report Saxon because he had repeatedly threatened to kill her.

The Department of Homeland Security, Office of Inspector General (DHS-OIG), opened an investigation and quickly began uncovering evidence corroborating the allegations.

**B. Police reports, recordings, and other sources all corroborated the allegations of severe abuse.**

A review of Saxon's criminal history revealed a December 2020 charge in the Superior Court of San Diego County, California, for Battery of a Current or Former Significant Other. Per the police reports, Individual 1 reported that Saxon had called her a "fucking pig" and then hit her across the left temple before pushing her down, holding her to the ground, and putting his hand over her nose and mouth, telling her to shut the fuck up. Individual 1 told a responding officer that Saxon had engaged in physical domestic violence approximately one to two times per month for the prior two and a half years and described an incident from September 2018 in which he had broken her nose after slamming her head to a tile floor. Individual 1 was nineteen years old in September 2018; Saxon was forty.

The California domestic violence case was later dismissed after Individual 1 said she did not want to press charges and, according to the report, "did not want to ruin [Saxon's] career."

About a year and a half later, in September 2022, Saxon's friends and coworkers at ICE requested a police welfare check after Saxon sent his supervisor angry texts about wanting to resign and then failed to report to work. A police report indicates that officers had responded to Saxon's residence the night before regarding a "possible domestic violence" situation. (Ex. A.)

Responding officers knocked on Saxon's door and announced themselves. They heard movement inside the apartment, but no one answered the door. (Ex. A.) After about five minutes,

the officers entered the apartment using a key from management and found Saxon holding a large knife to his throat. He refused repeated requests to "drop the knife." (*Id.*)

Saxon's refusal to drop the knife or come out of the apartment led to [redacted]

About six months after the standoff at Saxon's apartment, in March 2023, Individual 1—who was still living with Saxon—recorded a video capturing Saxon saying to her, in an aggressive tone, "You stupid fucking bitch. Ran around all day for you for food. You won't even eat a piece. Oh, what? You got a fat lip, bitch?" Individual 1 cries out as Saxon appears to approach her. He repeats, "You got a fat lip, bitch?" several times while Individual 1 cries. He continues: "You don't even have shit." Individual 1 then says, "Like I did it to myself?" Saxon replies: "Get the fuck out of here. You're done, man. If I fuckin' see you here in three days, you will be executed, you ugly fucking bitch." (Ex. E.)

Medical records show that, a few days later, on March 29, 2023, [redacted]

In approximately June 2024, Saxon and Individual 1 moved to Cincinnati,[2] where the evidence shows the abuse continued. Additional videos from Individual 1's iCloud account show Saxon acting violently toward her. In a video from November 2024, for example, Individual 1 is heard crying and saying something unintelligible, to which Saxon responds, "You fucking scum whore." Individual 1 continues to cry and asks Saxon to "go away." Individual 1 then says, "You

[2] The circumstances of this move, and of Saxon's transfer to ICE ERO's Blue Ash office, are discussed further below, in the section about Saxon's employment history.

punched me," leading Saxon to say, "Oh, I'm going to kill you" several times in a row. Saxon repeatedly calls Individual 1 a "fucking scumbag." A spraying sound is heard, and Individual 1 says, "Stop spraying me with soap!" Saxon responds, "Stay down, bitch," and the spraying sound is heard again. Individual 1 appears to be in distress and says, "This is disgusting; you sprayed soap all over my shirt!" Saxon replies, "Oh, you're afraid of soap, bitch?" and the spraying sound is heard again. (Ex. F.)

Additionally, from their move to Cincinnati in June 2024 through Saxon's arrest on December 5, 2025, CPD responded to Saxon's residence[3] at least two dozen times for reports relating to possible domestic violence. In many instances, it was Individual 1 calling 911, seeking help; in others, neighbors reported hearing a woman being abused.

For example, on April 26, 2025, two people called 911 about hearing a woman screaming. In one, a caller said, "There was a verbal argument that I heard, and I just heard her yell out, 'Help me, help me, I'm being abused.'" In the background of the call, a woman could be heard yelling. A second 911 caller reported that his next-door neighbor had "got[ten] thrown out into the hallway and I can, like, hear them through the door."

One of the neighbors took videos from the apartment hallway that night. In a video taken at 6:42 p.m., Saxon can be heard—from the hallway, through a closed door—yelling at Individual 1, "Get out. Get the money and go. Get the fuck out. Get out! I swear to God, you're done. Get the fuck out." Individual 1 can be heard saying, "I know – I'm going to get the fuck out in just a second." Saxon replies, "No phone, no nothing." In another video, taken at 7:15 p.m., Individual 1 says, "I just need to [UI]!" Saxon then yells: "No, you don't!" Then, more quietly, Saxon says: "Get up. Up. Up, in here. Get your suitcase; there's your shit. Use this. Here

[3] This total includes calls for service to a prior address in Oakley, where Saxon and Individual 1 lived when they first moved to Cincinnati in mid-2024.

you go." (Exs. G, H (redacted videos).)

Body-worn camera (BWC) footage shows that police responded to Saxon's apartment that night and found Individual 1 sitting in the hallway with an injured lip. The officers spoke to Saxon through the door, but he would not let Individual 1 in to get her cell phone. When officers asked him why, he responded, "What's going on is she's a very violent, vicious person. If I open the door and you see my right eye, you will have to arrest her."

Three days later, on April 29, 2025, EMTs responded to Saxon's apartment and found Individual 1 [redacted] The EMT's report states that Individual 1 "refused to elaborate" about why she had "a black eye and significant bruising over much of her body" and noted "concern for possible abuse conditions."

Individual 1 was taken to the emergency room, where evaluation showed [redacted]

On July 22, 2025, Individual 1 called 911 again, this time requesting that police escort Saxon out of the apartment. BWC shows that, when officers responded, Individual 1 again had a black eye and an injured lip. When officers asked Saxon what was going on, Saxon said it was nothing and that Individual 1 had a mental illness.

On August 24, 2025, Individual 1 called 911 again. She told responding officers that in

April Saxon had punched her three times in the abdomen and hurt her liver, and that he had broken her pelvis and an artery in her midsection. When the officers asked what had happened on the present evening, Individual 1 said Saxon had grabbed her hair and shoved her. She said Saxon was "getting brazen with everything because I didn't snitch on him when I was at the hospital [in April]." Individual 1 said she had packed to leave Saxon but didn't feel like she was well enough to travel because her pelvis was still hurting her. Individual 1 said Saxon was an Assistant Field Office Director and that she was normally very careful but that she was "done getting abused." One officer asked why Individual 1 didn't just leave; she responded, in a whisper, "I'm trying to but it's hard."

A few days later, on August 28, 2025, Individual 1 again called 911. She requested EMTs but "no police," saying she was "concussed, like, severely." The 911 operator asked whether there was a "physical domestic situation," but Individual 1 said she "[didn't] want to talk about that right now." The 911 operator said it was policy to send police officers with the EMTs. Individual 1 said that, in that case, she did not want EMTs to be sent.

BWC footage shows that EMTs and/or social workers did arrive on August 28, 2025. When Individual 1 answered the door, she had a black eye. An EMT mentioned that Individual 1 was anorexic, was very sick, and was skin and bones. One said she had bruises because she was emaciated. They discussed Individual 1's dangerously low blood sugar and how it would take six to eight months for her pelvis to recover. One EMT said they could not leave her in the condition she was in and that she was on her death bed; however, Individual 1 asked the EMTs to leave.

**C. On December 5, 2025, a neighbor saw Saxon put Individual 1 in a chokehold and drag her into their apartment.**

On December 5, 2025, at about 3:00 p.m., one of Saxon's neighbors called 911 and reported seeing a physical altercation between a man and a woman in the hallway of the apartment building where Saxon lives. On the 911 call and in a later written statement, the

witness said the man was "dragging [the woman] down the hallway in [a] chokehold" and that he was "screaming at her asking where 'the check' was." She reported that the man "continued to scream at [the woman] and jerked her around." According to the witness, the man then dragged the woman into an apartment (later identified as Saxon's), at which point the witness "heard him screaming at [the woman], and then . . . heard him slap her and she screamed."

Another neighbor took videos from the hallway, capturing the sound of an aggressive argument between Saxon and Individual 1 happening inside Saxon's apartment. (Exs. I-K.) Although not all their words can be made out, Saxon can be heard yelling, among other things, "Get up," "Bitch," and "Fuck you! Fuck you!"; Individual 1 seems to be screaming in fear. Other sounds consistent with a physical altercation can also be heard.

Shortly after the 911 call, CPD officers responded to Saxon's apartment complex, where they found Individual 1. She did not wish to make a statement; however, officers can be heard on the BWC video observing bruising on her neck, consistent with her having been strangled.

**D. After his arrest a few hours later, Saxon lied to a federal agent about the attack on Individual 1.**

At about 1:00 a.m. on December 6, 2025, CPD arrested Saxon on felony charges of Felonious Assault and Strangulation, as well as a misdemeanor Domestic Violence charge.

About an hour later, a DHS OIG Special Agent and a CPD officer conducted a recorded interview of Saxon. The Special Agent told Saxon she was a special agent with the DHS OIG and read him his Miranda rights, which he waived in writing.

Saxon told the agent Individual 1 was his ex-girlfriend and that they had dated for about five years. He said that, earlier that day, he had slipped a cashier's check under the door for Individual 1 and that he was paying her to move on so he could go on with his life.[4] He claimed

[4] Note that this corroborates the 911 caller's statement that the man and woman she had seen had been arguing about a "check."

he had only spoken with Individual 1 by phone that day and had not seen her in person:

| | |
|---|---|
| Special Agent: | So, CPD received complaints today that you and [Individual 1] had an argument at the apartment. |
| Saxon: | Okay. |
| Special Agent: | And so, and you know this. I do have to tell you, but you know this. You're a federal officer; I'm a federal officer. Anything you say, be truthful, because lying to me -- just lying to me is a crime in itself. I don't think you're going to be untruthful. You know how it goes. I have to advise you of that, and you know that already. But, so, there were complaints that they heard an argument. And you know there's cameras at the apartment -- |
| Saxon: | Yeah, sure. |
| Special Agent: | So, let's just go back for a second. So, did you have any conversations with [Individual 1]? |
| Saxon: | **[Individual 1]? No, I'm texting, I'm texting through the -- over the phone.** |
| Special Agent: | Okay. Well, neighbors wouldn't complain about you texting over the phone. |
| Saxon: | **Yeah, no, no, but if she's in there screaming at me over the phone.** |
| Special Agent: | Okay. |
| Saxon: | [Laughs] So, yeah. |

Later, the Special Agent told Saxon she did not think he was being completely honest. Saxon again denied interacting with Individual 1 in person:

| | |
|---|---|
| Special Agent: | Okay, Sam, I don't think you're being completely honest with me. |
| Saxon: | Okay. All right. |
| Special Agent: | About today. I think that we've talked to a couple different neighbors who said they saw you arguing, and they saw you in the hallway arguing. So I want you to really think hard about arguing with [Individual 1] today. |
| Saxon: | **Yeah. No. No, I mean -- I was in the garage -- I'm** |

**getting my days confused. I was in the garage for quite a bit today, yeah. Just sitting there**.

When confronted with a witness's report of seeing a man strangle a woman, Saxon again claimed that he had not interacted with Individual 1 in person that day:

| | |
|---|---|
| CPD Officer: | Do you want to hear the accusation that we got today? |
| Saxon: | That's fine. I mean, I imagine -- now that you're telling me all this, it's not about the dude at the Mexican place, so [laughs] -- |
| CPD Officer: | We got called for neighbors seeing a man choking a female -- |
| Saxon: | Oh, gosh. |
| CPD Officer: | And dragging her into the apartment. Eye independent [sic] witnesses. Multiple. Saying -- and then when we got there we talked to [Individual 1] and she had bruises around her neck. |
| Saxon: | Oh, gosh. |
| CPD Officer: | So, do you know how that happened? |
| Saxon: | No. |
| CPD Officer: | **You never had any physical react-, interaction with her today?** |
| Saxon: | **With Individual 1? No. On the telephone, yeah.** |
| CPD Officer: | **Nothing on the telephone?** |
| Saxon: | **No, just on, just on the phone**. |
| CPD Officer: | **Just on the phone?** |
| Saxon: | **Yeah.** |

These statements were false: Saxon had interacted with Individual 1 in person earlier that day in the hallway of his apartment, as well as inside the apartment. A neighbor saw him put Individual 1 into a headlock and drag her, still in the headlock, into his apartment; the neighbor heard him yelling at Individual 1 about a "check," consistent with his admission in the interview

that he had come over to give her a check; and when officers arrived shortly thereafter, they saw bruising on Individual 1's neck, consistent with the 911 caller's observations.

### E. At the same time that he was abusing Individual 1, Saxon was also failing to report for duty, submitting false time sheets, failing to report police contacts, and being disrespectful to his supervisors.

For at least several years, and during the same period that he was physically and verbally abusing Individual 1, Saxon was an erratic and difficult colleague. He was also defrauding the government by failing to report for duty and then submitting false time sheets.

#### 1. Saxon was commonly erratic and disrespectful toward his supervisors.

In interviews, Saxon's direct supervisor, who works in Detroit, said that, as Assistant Field Office Director (AFOD), Saxon's main duties generally kept him in the office rather than in the field. And, in the eighteen months Saxon had been in the Blue Ash Office, he had often been a problem for management. If Saxon was directed to do something he didn't want to do, he became a loose cannon—sending unprofessional messages on group chats, threatening to resign, and going radio silent. For example, his supervisor described a time when ICE Enforcement and Removal Operations needed to transport detainees south and Saxon was asked to send personnel to meet halfway to help—but, in the supervisor's words, Saxon went "bonkers" and refused.

In May 2025, when headquarters requested additional support on weekends, Saxon, on a group text that included four other colleagues, wrote, "I'll be resigning from my position. Do not raid my home. Target date is 6/23/25 [the one-year mark for his transfer to Cincinnati]. I'll send [a colleague] a message and we will work it out. I'm just gonna live my life. I'm done."

A few days later, when the supervisor asked Saxon to send the names of the five agents who had worked in Cincinnati that day, Saxon wrote back: "Why do you need their names? Explain it to me. You are pushing me to the edge of sanity. Respond to that." When the supervisor explained that the request was coming from headquarters and that he was required to

send the information daily, Saxon responded, “Have fun with that. I am dead serious. Target date 6/23 for resignation,” saying that he wanted to hit the one-year mark in Cincinnati so he wouldn’t have to pay back moving expenses that had been covered by the government.

According to the supervisor, Saxon emailed a resignation a few days later but then retracted it.

**2. Saxon commonly showed up late, left early, took long lunches, or didn’t show up at all—and then claimed full-time, in-person work on his timesheets.**

On top of his erratic and unprofessional behavior toward his supervisors, Saxon commonly failed to report for duty and yet submitted time sheets claiming a full-time, in-person work week. For example, Saxon did not use his government-issued personal identity verification (PIV) card to enter the Cincinnati Sub Office of ICE, or any other building, from August 21 through September 16, 2025, which includes eighteen workdays. He didn’t log onto ICE’s network from the office either—and, when his supervisor called the office looking for him, a colleague reported not having seen him for days. Although Saxon did request some leave during that period, for nine of those eighteen workdays, he claimed on his timesheet to be working when he was not—and was paid accordingly.

As another example, on his timesheet for October 20, 2025, Saxon certified that he worked eight hours in the office and took an additional three hours of sick leave. But the evidence shows that Saxon did not report to work at the office at all that day, because:

- He did not use his PIV card to enter the Cincinnati Sub Office;
- He was not captured on ICE surveillance video reporting to work;
- ICE’s records show that his computer never logged onto the network from the Cincinnati Sub Office; and
- Other logs stored by ICE show that he logged onto his computer during working hours only once, at approximately 1:04 p.m.

ICE’s PIV card records only go back to July 28, 2025, so the clearest picture of Saxon’s work habits comes from the period between that date and Saxon’s arrest on December 5, 2025.

Of the approximately ninety-one workdays, approximately twenty—or twenty-two percent of the total—were days when Saxon did not swipe into the office at all. And yet, on all of those days, Saxon claimed to have performed nine or more hours of in-person work.

Even when Saxon did report to work, he frequently showed up late, took extended lunches, and left early. The colleague mentioned above, whose office was next to Saxon's, reported that, about once a week, Saxon would arrive in the late morning or early afternoon, drop off a government vehicle, and then leave immediately in his personal car. And on days when Saxon stayed, he usually didn't arrive until around 10:30 or 11:00 a.m. and would leave at various times throughout the day. This colleague also reported that there were many days when Saxon would get to the office, immediately go to lunch, and then leave shortly after lunch. This colleague eventually stopped joining Saxon for the extended lunches because he/she did not feel right taking such long lunches when other employees were working and the office was so busy.

ICE's records corroborate that account. On approximately thirty-three of the seventy-one days with a recorded PIV card entry—nearly half of the days when he showed up at all—Saxon arrived at 10:00 a.m. or later. And, although he did not have to swipe his PIV card on the way out, of the approximately fifty-seven workdays for which surveillance video is available (from September 17 through December 5, 2025), the government identified only approximately three days on which he stayed until at least 5:00 p.m.

For example, on his timesheet for November 4, 2025, Saxon certified that he had worked nine hours and forty-five minutes in the office, with no telework time.[5] But the evidence shows he was at the office for only about five hours:

[5] Note that, starting no later than February 10, 2025, telework was only authorized on a situational/episodic basis and required approval by a first-line supervisor—something Saxon never sought or received. Regardless, although his timesheet allowed him to indicate that he was teleworking, Saxon never did so.

- PIV card logs and surveillance video show that he reported to the office at about 10:23 a.m.
- ICE's logs show that his work computer was at the Cincinnati Sub Office from approximately 11:00 a.m. until 3:20 p.m.
- Other logs show that his last login to his computer was approximately 1:23 p.m.
- Surveillance video shows he left at 3:26 p.m.
- Key fob logs from Saxon's apartment building show that he was back at his apartment by 4:29 p.m.

As a final example, on the day of his arrest, December 5, 2025, which was a workday, surveillance video shows Saxon arrived at 11:41 a.m. and left just six minutes later, at 11:47 a.m. Key fob data shows he was back at his apartment by 12:55 p.m. And, on top of it all, when questioned by the DHS OIG agent about his whereabouts that day, Saxon falsely claimed that he had stopped by the office to swap cars and then gone to a hotel to work, when in fact the evidence shows that, rather than working, he went to his apartment and abused Individual 1.

Together, these records show a pattern of Saxon claiming hours for work he never performed, in addition to a general pattern of deceit.

**3. Saxon never reported any of his contacts with police to ICE, even though he was required to do so by DHS policy.**

DHS policy required Saxon to report any time he was "off-duty and not acting in an official capacity and [was] questioned [or] interviewed . . . as a subject of an . . . investigation by a law enforcement agency."[6] But although police responded to Saxon's apartment approximately two dozen times in the eighteen months he was living in Cincinnati, Saxon never once reported these contacts to ICE. And although there is evidence that police also responded to Saxon's residence in California (including, for example, on the night before the standoff described above), the DHS OIG could find no evidence that Saxon reported these police contacts either.

[6] *See* Russell C. Deyo, "Required Reporting of Off-Duty Contact with Law Enforcement by DHS Law Enforcement Personnel and the Suspension and/or Revocation of Authority to Carry a Firearm or other Weapon and Perform Law Enforcement Duties" (Jan. 10, 2017), at 6, *available at* https://www.dhs.gov/sites/default/files/publications/mgmt/law-enforcement/mgmt-dir_045-06-required-reporting-off-duty-with-law-by-dhs-law-enforcement.pdf (last accessed Oct. 13, 2026).

The only exception is when charges were filed against Saxon in the 2020 domestic violence case in California. Notably, Saxon didn't report to ICE that on September 30, 2020, local police had interviewed him about the alleged domestic violence incident. It was only months later, in December 2020, after Saxon learned of the charge against him—at which point there was no avoiding it—that Saxon disclosed the charge to his office.

**4. Earlier employment records provide additional context for Saxon's workplace misconduct.**

[redacted]

7 [redacted]

[redacted]

[redacted]

## III. LEGAL STANDARD

### A. Procedures for Determining a Sentence

The Sentencing Guidelines "should be the starting point and the initial benchmark for choosing a defendant's sentence." *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020) (internal quotations omitted). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Then, "the district court must weigh and apply the range of factors outlined in 18 U.S.C. § 3553(a)." *Id.* at 49-50. These include (1) the nature and circumstances of the offense and the history and characteristics of the defendant and (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a). The Court should impose a sentence sufficient but not greater than necessary to satisfy the purposes of sentencing Congress identified in 18 U.S.C. § 3553(a)(2). *See* 18 U.S.C. § 3553(a).

### B. Courts may vary upward from the guidelines range if the § 3553(a) factors warrant it.

The Sixth Circuit has explained that, in fashioning an appropriate sentence, courts must not "lash themselves to the guidelines range," but must instead "independently apply the § 3553(a)

factors to each defendant" to determine whether a sentence below, within, or above the guidelines is warranted. *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). And, in applying the § 3553(a) factors, a federal court "may consider, without limitation, any information concerning the background, character and conduct of the defendant . . . ." U.S.S.G. § 1B1.4 (emphasis added); *accord* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). Oftentimes—as in this case—the § 3553(a) factors will warrant an upward variance. *See, e.g.*, *Rayyan*, 885 F.3d at 443 (concluding that an upward variance, based in part on uncharged conduct, was merited under the § 3553(a) factors—specifically, to protect the public, deter criminal conduct, and reflect the seriousness of the offense); *United States v. Williams,* 807 F. App' x 505 (6th Cir. 2020) (affirming district court's upward variance based on uncharged conduct considered as part of a defendant's history and characteristics, and because the defendant's long-running counterfeiting scheme was outside of the "mine run" offense); *United States v. Alsante*, 812 F.3d 544 (6th Cir. 2016) (affirming the sentencing court's upward variance based in part on conduct related to pending state charges for sexual misconduct with a minor and holding that a sentencing court may consider wide-ranging "background, character, and conduct").

## IV. ARGUMENT

### A. The PSR sets out the correct statutory maximums and Guidelines ranges.

The Presentence Investigation Report ("PSR") correctly states that Saxon faces a maximum potential sentence up to five years' imprisonment, up to three years of supervised release, up to a $250,000 fine, and a mandatory $100 special assessment. (PSR ¶¶ 81, 84, 91, 92.)

The PSR also correctly calculates the advisory Guidelines in this case. Although the

offense of conviction initially references U.S.S.G. § 2B1.1, it cross-references to U.S.S.G. § 2J1.2 because Saxon's false statement constituted obstruction of justice.[9] (PSR ¶ 22.)

Under U.S.S.G. § 2J1.2(c)(1), if the offense involved obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense. (PSR ¶ 22.) The underlying offense for Saxon's obstruction is the incident of domestic violence against Individual 1 on December 5, 2025. (*Id.* ¶ 23.) That conduct is governed by U.S.S.G. § 2A6.2 and gives a base offense level of 18. (*Id.* ¶ 24.) The PSR then correctly applies a four-level enhancement because the incident involved strangling Individual 1 and causing her bodily injury. (PSR ¶¶ 24-26.)

Upon returning to § 2X3.1, the offense level is decreased by six levels pursuant to subsection (a). (PSR ¶ 27.) This gives a base offense level of 16. (*Id.*)

After deducting two points for acceptance of responsibility, Saxon's total base offense level is 14. (PSR ¶ 36.) A total offense level of 14, coupled with a criminal history category of I, yields an advisory sentence of 15-21 months. (PSR ¶ 82.)

The guidelines further recommend a fine of between $7,500 and $75,000. (PSR ¶ 93.)

**B. A consideration of the § 3553(a) factors shows that a sentence at the statutory maximum of five years' imprisonment and three years of supervised release, as well as a fine, is appropriate in this case.**

The government respectfully requests that the Court sentence Saxon to the five-year statutory maximum term of imprisonment and three years of supervised release, and that the Court consider imposing an appropriate fine. As explained more fully below, the government's

[9] Note that, where, as here, a defendant is convicted under § 1001(a)(2) with a five-year statutory maximum, the initial reference, in Appendix A of the Guidelines, is to § 2B1.1. When a defendant is convicted of a statutory enhancement resulting in an eight-year statutory maximum, the initial reference is to § 2J1.2, which is what is cited in the PSR. Although the government believes the PSR's starting reference to § 2J1.2 is incorrect, the result is the same due to § 2B1.1's cross-reference to § 2J1.2. The government did not notice this issue during the PSR process and apologizes for not bringing it to the Probation Officer's attention in time for it to be amended in the Final PSR.

request for an upward variance is warranted by the § 3553(a) factors and supported by precedent.

**1. The nature and circumstances of this offense support a sentence of five years.**

The nature and circumstances of Saxon's offense strongly support a sentence of five years' imprisonment.

Even in the "mine run" case, a § 1001 violation is a serious, standalone offense. The statute originally criminalized only false statements resulting in a financial loss to the government, but it was amended in 1934 to reflect Congress's "intent to protect the authorized functions of governmental departments and agencies from the perversion which might result" from deceptive practices. *United States v. Gilliland*, 312 U.S. 86, 93 (1941); *accord* 142 Cong. Rec. S4857 (May 8, 1996) (statement of Sen. Arlen Specter introducing bill to expand § 1001) ("The cardinal principle at stake is that in dealing with the Government . . . people must, in the words of Justice Holmes, 'cut square corners,' just as the Government must cut square corners in dealing with its citizens. One who lies to an entity of Government . . . is under a justifiable expectation that if he or she lies, he or she will be punished.").

Lying to criminal investigators is squarely within the ambit of § 1001: "Certainly the investigation of wrongdoing is a proper governmental function; and since it is the very *purpose* of an investigation to uncover the truth, any falsehood relating to the subject of the investigation perverts that function." *Brogan v. United States*, 522 U.S. 398, 402 (1998) (emphasis in original). And courts have recognized that, where, as here, a lie is designed to subvert a criminal investigation, a § 1001 offense is particularly worthy of punishment. *See id.* at 405 (noting that Congress has "decreed the obstruction of a legitimate investigation to be a separate offense, *and a serious one*" (emphasis added)). Among other things, false statements in criminal investigations can delay or prevent prosecutions of violent offenders, waste government resources, and increase the risk to the public.

And preventing the prosecution of a violent offender—himself—was plainly Saxon's goal. The evidence shows that on December 5, 2025, a Friday, he skipped work and instead went home, where he violently assaulted Individual 1 by putting her into a headlock and dragging her down the hallway and into their apartment, all while screaming at her loudly enough to alert the neighbors. He strangled her with sufficient force to leave visible marks on her neck. And then, when a DHS OIG agent questioned him about it, he lied—not only about what had happened that day, which is the lie with which he was charged, but also about his years of abusing Individual 1. He falsely claimed he had "never" harmed Individual 1 and "never" threatened to harm or kill her—claims clearly contradicted by, among other things, Individual 1's surreptitious videos showing him do just that.

The Guidelines apply a cross-reference to reflect that his lie was designed to obstruct a criminal investigation into domestic violence, making clear that the seriousness of a § 1001 offense is connected to the seriousness of the underlying conduct. But the cross-reference does not reflect a crucial circumstance of this offense: that Saxon was not lying to cover up someone else's crime, but a crime he himself committed. The Guidelines range would be identical if Saxon had lied to cover up someone else's attack on Individual 1—which is one of many reasons why an independent consideration of the § 3553(a) factors is necessary to fashion a just sentence in this case.

Courts have imposed significant upward variances in analogous cases in which defendants lied about crimes they had committed—including a recent case in this district in which the court varied upward to the statutory maximum. *See United States v. Tanzer*, No. 3:24-CR-107, ECF No. 66 (S.D. Ohio Jan. 29, 2026) (varying upward to run three sixty-month sentences consecutively for a defendant convicted of lying about rapes he had committed); *see also, e.g.*, *United States v. Fein*, 843 F. App'x 765, 768 (6th Cir. 2021) (affirming an upward

variance for a defendant convicted under § 1001 for lying to the FBI about whether he possessed firearms in violation of a court order); *United States v. Smith*, 516 F.3d 473, 478 (6th Cir. 2008) (affirming an upward variance in a fraud and false-statements[10] case in which the defendant used donations intended for victims of 9/11 to pay for alcohol, drugs, vacations, furniture, jewelry, and electronics, and then lied about it; noting that the "setting of the crime"—the fact that the money was intended to benefit 9/11 victims—was "an eminently sensible consideration in weighing the 'nature' and the 'seriousness of the offense'"); *United States v. Richart*, 662 F.3d 1037, 1048 (8th Cir. 2011) (affirming an upward variance to the statutory maximum for a woman who lied to the FBI about a murder she had committed); *United States v. Gangapersad*, 22-cr-3171, 2023 WL 8540428 (2d Cir. Dec. 11, 2023) (affirming the district judge's upward variance in a § 1001 case based on the "seriousness of the offense and the need for general deterrence," and noting that the weight given to any single factor is "a matter firmly committed to the discretion of the sentencing judge").

The Sixth Circuit has also held that repeated lies during a single interview can support an upward variance. In *United States v. McCafferty*, 482 F. App'x 117 (6th Cir. 2012), for example, the Sixth Circuit approved of the sentencing judge's consideration of the defendant's repeated lies to FBI agents about the same subject matter during a single interview, noting that "[i]f anything, with each rephrased question, the agents gave [the defendant] additional chances to tell the truth—she declined each offer." *Id*. at 127. In this case, the federal agent gave Saxon multiple chances to be truthful—chances he repeatedly failed to take.

The severity and duration of the underlying abuse, the repeated threats to kill Individual 1, and Saxon's persistent denials all distinguish this offense from a "mine run" false-statement

[10] The defendant's false statements were made on a loan application and charged under 18 U.S.C. § 1014.

case and support the requested upward variance.

**2. Saxon's history and characteristics further support the requested sentence.**

Saxon's history and characteristics provide additional aggravating circumstances. He came from a life of relative privilege, especially compared to many defendants who appear before this Court for sentencing. He was born to parents who were married and employed, and he lived in a "nice, big, ranch-style house with a large yard." (PSR ¶ 52.) His grandmother was also available to care for him. (*Id.* ¶ 54.) He was always "well provided for" in terms of necessities, and, although he had to do chores, "there was still plenty of time to have fun and goof off." (*Id.*) He played sports and enjoyed hunting with his father and brother and riding four-wheelers through the woods, and his family went camping and on vacations to other states. (*Id.*) He never experienced or witnessed any violence or substance abuse by his parents. (*Id.* ¶ 55.) He was never bullied at school and had no learning disabilities. (*Id.* ¶ 56.)

After graduating from high school, Saxon earned a bachelor's and a master's degree from Kent State University. And then he began working for ICE, joining the agency in 2005 and continuing there for almost twenty years, when he was arrested in this case.

The government anticipates that the defense will cite Saxon's twenty years of federal service in mitigation. But that service must be considered alongside the documented misconduct. The record from the last several years shows that Saxon was a difficult employee who was disrespectful to his superiors—someone who commonly sent rude texts, threatened to resign, and refused direct orders. On top of that, he commonly showed up late, left early, or skipped work entirely—and then defrauded the government by lying about his hours on his timesheet. These facts substantially diminish the mitigating weight of his employment record.

Moreover, Saxon's position as a sworn law enforcement officer also bears on the seriousness of his conduct. We entrust law enforcement officers like Saxon with the

responsibility of enforcing our Nation's laws, and in turn, we expect them to act with decency, honesty, and integrity. Saxon took an oath to "support and defend the Constitution of the United States" and to "well and faithfully discharge [his] duties." But while working for ICE and representing the United States to the public, he was committing violent crimes against Individual 1, violating ICE policy by failing to report his police contacts to his agency, and, ultimately, lying to federal investigators—all things that undermine the public's confidence in law enforcement. The Court should weigh that breach of public trust against the mitigating value of his service.

A public official's breach of trust can bring a false-statement case outside the "mine run" and support an upward variance. In *McCafferty*, the Sixth Circuit affirmed an upward variance where a sitting judge repeatedly lied to the FBI about her improper intervention in cases. 482 F. App'x at 127. The court described that conduct as a "shock to our system of justice and the rule of law." *Id.* Similarly, in *United States v. Cordero*, 609 F. App'x 73 (3d Cir. 2015), the Third Circuit affirmed an above-Guidelines sentence for a veteran police officer convicted of obstruction and making false statements in part because, "as a police officer . . . he def[ied] the law he was sworn to protect." *Id.* at 78.

Far from offering any mitigation, therefore, Saxon's history and characteristics, including his continued deception, weigh strongly in favor of an upward variance to the statutory maximum.

**<u>3. A five-year sentence is necessary to deter Saxon from committing future crimes and to protect Individual 1, as well as to send a message of general deterrence.</u>**

Saxon's sustained pattern of abuse shows that he presents a serious risk of further violence. The record describes repeated assaults and death threats over at least several years, continuing despite hospitalizations, numerous police responses, and a move to another state. That

persistence supports the government's concern that Individual 1 will face renewed abuse when Saxon returns to the community.

A defendant's ongoing danger to the public can support an upward variance. In *United States v. Fein*, 843 F. App'x 765 (6th Cir. 2021), for example, the Sixth Circuit affirmed an upward variance for a defendant who had lied to the FBI about possessing a firearm in violation of a court order. Evidence of firearm and bomb components informed the assessment of his danger to the public. In affirming the variance, the court emphasized the sentencing judge's reliance on specific deterrence and the risk of further harm. *Id.* at 774; *see also United States v. Cechini*, 834 F. App'x 201, 203 (6th Cir. 2020) (affirming the district court's upward variance based in part on the defendant's "long pattern of abuse in domestic situations" and the court's concern about the ongoing risk he presented to the public and to specific victims).

The sentence must also deter others—and especially law enforcement officers—from obstructing investigations into violent crimes and other serious misconduct. A five-year sentence would reflect the seriousness of Saxon's offense and the violence it sought to conceal, while also promoting respect for the law and both specific and general deterrence.

**4. A three-year term of supervised release, with a special condition limiting contact with Individual 1, would support the goals of sentencing in this case.**

The government respectfully submits that a three-year term of supervised release, the maximum permitted by statute, will help prevent Saxon from falling back into a pattern of abuse of Individual 1. In addition to the conditions recommended by the Probation Officer, the government respectfully requests that Saxon be prohibited from communicating or otherwise interacting with Individual 1, directly or indirectly, without the prior permission of the United States Probation Office.

Individual 1 has not requested such a restriction; as noted, she has not cooperated with the government's investigation. Nevertheless, the Court has an independent obligation to fashion

conditions of supervised release that are reasonably related to, among other things, deterrence and the need to protect the public. *See* 18 U.S.C. 3583(d)(1) (directing courts to consider these factors in fashioning special conditions of release).

Given Saxon's years-long abuse of Individual 1, a restriction on contact is reasonably related to those purposes and provides an important safeguard upon his return to the community. At the same time, the requested condition involves "no greater deprivation of liberty than necessary." 18 U.S.C. § 3583(d)(2). It does not permanently prohibit contact between Saxon and Individual 1 but instead permits contact with the approval of the Probation Officer, who will be positioned to assess the circumstances existing at the time of Saxon's release. *See United States v. Williams*, 169 F.4th 727, 733 (6th Cir. 2026) (upholding a restriction on contact with the defendant's romantic partner based in part on threats to kill her and noting that the condition permitted contact with the probation officer's approval).

**5. A fine is also appropriate.**

The United States respectfully requests an appropriate fine. The Guidelines provide that a court "shall impose a fine in all cases" unless the defendant establishes that he is unable to pay and is unlikely to become able to pay a fine. U.S.S.G. § 5E1.2(a). In determining the appropriate fine, a court should consider, among other things, the defendant's financial resources and earning capacity, the need to promote respect for the law and provide just punishment, the need for adequate deterrence, and "the need for the combined sentence to reflect the seriousness of the offense." *See* 18 U.S.C. §§ 3553(a), 3572(a); U.S.S.G. § 5E1.2(d).

Those considerations support a meaningful financial penalty here. Saxon spent approximately twenty years as a federal law enforcement officer—a position that entrusted him with substantial public responsibility and provided him with the salary and benefits of federal employment. At the time of his arrest, he was making more than $195,000 per year and was

eligible to receive matching funds from the government when he contributed to his Thrift Savings Plan, which now, according to the PSR, has a value of approximately $800,000.

Yet the evidence shows that, during at least the months preceding his arrest (when the evidence is freshest), Saxon repeatedly failed to report for work while nevertheless claiming full workweeks on his time sheet and accepting the resulting compensation. As set forth elsewhere in this memorandum, that conduct was consistent with a broader pattern, stretching back years, of a lack of professionalism and a disregard for the authority of his supervisors.

A meaningful fine would promote respect for the law and provide additional deterrence to government employees considering falsifying their timesheets or otherwise defrauding the government they serve. The United States respectfully asks the Court to consider Saxon's pattern of time-and-attendance fraud in that light, rather than to treat the fine as a substitute restitution award or a forfeiture of benefits and salary from uncharged conduct.

The Probation Officer found that Saxon has a positive net worth and can pay a fine. (PSR ¶ 80.) The amount of any fine should reflect Saxon's resources, earning capacity, and other obligations, including any CJA reimbursement (discussed below). *See* 18 U.S.C. 3572(a)-(b); U.S.S.G. § 5E1.2(d)-(e).

Accordingly, in addition to the other components of the sentence requested by the United States, the government respectfully requests that the Court impose a fine in an amount sufficient, but not greater than necessary, to provide just punishment, promote respect for the law, and afford adequate deterrence.

**C. The United States further requests that the Court consider whether some or all of the costs of Saxon's court-appointed representation should be reimbursed pursuant to 18 U.S.C. § 3006A.**

The United States respectfully requests that the Court consider whether reimbursement of some or all of the costs of Saxon's court-appointed representation would be appropriate under 18 U.S.C. § 3006A(c) and (f).

The United States has not sought or obtained Saxon's CJA financial affidavit, takes no position as to what he disclosed, and does not question the appointment decision based on the information then available.

However, the PSR reports approximately $800,000 in Saxon's Thrift Savings Plan account, as well as another approximately $10,000 in cash. Saxon also reported having another brokerage account but did not provide the balance. As noted, the Probation Officer concluded that he had a positive net worth and the ability to pay a fine. The government respectfully submits that this information warrants a current, individualized inquiry into whether Saxon has funds available for CJA reimbursement.

The Criminal Justice Act authorizes such an inquiry. If, "at any time after the appointment of counsel," the Court finds that a defendant "is financially able to obtain counsel or to make partial payment for the representation," the Court may authorize payment under § 3006A(f). *See* 18 U.S.C. § 3006A(c). Section 3006A(f), in turn, permits the Court, upon finding that "funds are available for payment from . . . a person furnished representation," to direct payment to the Court for deposit in the Treasury as reimbursement of CJA expenditures.

The Sixth Circuit has recognized the authority to order retrospective reimbursement after a thorough financial inquiry. *See United States v. Wilson*, 597 F.3d 353, 358-60 (6th Cir. 2010). The inquiry is a pragmatic one that considers the defendant's ability to pay, available funds, and the interests of justice. *Id.* at 359.

The United States therefore requests that the Court conduct the financial inquiry contemplated by § 3006A and, if it finds funds available within the meaning of § 3006A(F), order reimbursement in an appropriate amount. The government does not request access to Saxon's CJA financial affidavit and leaves the manner of conducting that inquiry, as well as the appropriate amount and terms of any reimbursement, to the Court.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence Saxon to five years' imprisonment, three years of supervised release (with the special condition described above), a fine in an amount the Court deems appropriate, and a $100 special assessment.

The United States further requests that the Court conduct a financial inquiry to determine whether some or all of the costs of Saxon's court-appointed representation should be reimbursed pursuant to 18 U.S.C. § 3006A.

Respectfully submitted,

*/s/ Julie D. Garcia / Ashley N. Brucato*
JULIE D. GARCIA (CA 288624)
Special Assistant United States Attorney
ASHLEY N. BRUCATO (OH 90989)
Assistant United States Attorney
United States Attorney's Office
221 E. Fourth St. – Suite 400
Cincinnati, OH 45202
Julie.Garcia@usdoj.gov
Ashley.Brucato@usdoj.gov